773 A.2d 693

ROBERT ALSTON, PLAINTIFF–RESPONDENT, v. CITY OF CAMDEN, CAMDEN POLICE DEPARTMENT AND OFFICER RON CONLEY, DEFENDANTS–APPELLANTS.

Argued March 26, 2001—Decided June 28, 2001.

172

*Terrence L. Lavy,* Assistant City Attorney, argued the cause for appellants (*John A. Misci, Jr.,* City Attorney, attorney).

*Mario A. Iavicoli* argued the cause for respondent.

The opinion of the Court was delivered by

ZAZZALI, J.

This matter implicates anew the question of whether and under what circumstances the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, affords immunity to a police officer and his public-entity employer. Defendant Ron Conley, a Camden City police officer, was pursuing a drug suspect on foot when his firearm discharged, resulting in plaintiff Robert Alston, an innocent by-stander, being struck in the hip by a bullet. Plaintiff sued Conley, the City of Camden, and the Camden Police Department. The trial court held that the pursuit immunity and good faith immunity provisions of the Tort Claims Act applied to the circumstances and that defendants could be liable only if they had engaged in willful misconduct. The Appellate Division reversed, concluding that the Legislature did not intend immunity to apply when the officer's negligent discharge of a firearm causes injury to an innocent third party. We reverse and reinstate the judgment of the Law Division.

I

On July 3, 1993, at approximately 2:00 p.m., defendant Conley responded to a call that a female was selling drugs in an alley in Camden. Defendant was a shift detective at the time and was not in uniform. He observed a woman near that location engage in

what appeared to be a drug sale with two men. After defendant exited his vehicle and identified himself as a police officer, the woman ran away. Defendant pursued her on foot as she proceeded to cross a large puddle that covered the width of the alley. Defendant testified as follows:

As I'm about to exit the puddle, I feel my gun beginning to dislodge—I feel my gun beginning to dislodge from my holster. But it happened very very quick. I'm running. I feel it dislodging and falling. I try to grab the gun but I never grabbed the gun. The gun dropped, hit the ground. Simultaneously to it hitting the ground, I heard a round discharge.

Defendant emphasized at trial that he was not seeking to draw his gun, a semi-automatic pistol, either to fire at the suspect or to fire a warning shot. He testified: "I did not at any time during this incident . . . remove my gun from my holster. There was no need to. The incident didn't dictate it." Rather, defendant testified that the weapon merely dislodged from his holster.

Defendant also noticed that his weapon's safety device was in the "fire" position. He testified that it was his practice to carry the gun with the safety lock in the "no-fire" position even when pursuing a suspect. At the time of the incident, however, defendant explained that the gun was in the fire position because he had drawn his gun earlier in the day during the course of an unrelated police encounter with pit bulls, after which he inadvertently failed to return the safety device to the non-fire position. Defendant acknowledged that it is not police department policy to have officers carry their guns with the safety lock in the fire position.

After the gun discharged, defendant testified that he heard a commotion behind him, stopped, and saw plaintiff on the ground moaning. Realizing plaintiff had been shot, defendant testified that he discontinued the pursuit, called an ambulance and a back-up unit, and tended plaintiff until the ambulance arrived.

Plaintiff's version of events at trial was slightly different. Plaintiff testified that he was walking with a friend when he noticed a young girl run by him. About two seconds later, plaintiff also saw defendant run by, chasing the girl. After plaintiff witnessed defendant grab his pistol with his hand while he was running,

plaintiff focused his attention on the girl who was running. Plaintiff next heard the gun discharge. He felt pain in his hip and realized he had been shot. He then saw defendant's gun "bouncing" on the ground seconds later, although plaintiff had not seen it fall to the ground because he was watching the fleeing girl. Plaintiff testified that defendant noticed he was shot, but continued pursuing the woman and tended to him only after he apparently lost pursuit of the drug suspect.

Plaintiff filed this negligence action against the City of Camden, the Camden Police Department, and Conley. A jury trial commenced in April 1999. At the close of trial, the court instructed the jury that under the pursuit immunity provision of the New Jersey Tort Claims Act, N.J.S.A. 59:5-2b(2), defendants were entitled to immunity during the course of a police pursuit unless the jury determined that defendant Conley's conduct rose to the level of willful misconduct. The court defined willful misconduct in part as requiring "a knowing violation by an officer of a specific command by a superior officer of a standing order that would subject the officer to discipline." Following deliberations, the jury returned a verdict in favor of defendants.

Plaintiff appealed, arguing that pursuit immunity applies only in motor vehicle chases as in *Tice v. Cramer*, 133 *N.J.* 347, 627 *A.*2d 1090 (1993), and *Fielder v. Stonack*, 141 *N.J.* 101, 661 *A.*2d 231 (1995). In the alternative, plaintiff argued that the trial court improperly instructed the jury with respect to the meaning of "willful misconduct." The Appellate Division held that the doctrine of pursuit immunity is inapplicable where, as here, the negligent conduct of the police officer during pursuit involves the use and handling of a police firearm. It also concluded that good faith immunity does not apply where a police officer's unintentional or negligent discharge of a weapon caused injuries. The appellate panel remanded the matter for a new trial, directing that defendant "Conley's liability is to be determined to the same extent as a private person." *Alston v. City of Camden*, 332

*N.J.Super.* 240, 249, 753 *A.*2d 171 (2000). This Court granted certification, 165 *N.J.* 607, 762 *A.*2d 221 (2000).

## II

The New Jersey Legislature adopted the Tort Claims Act in 1972. *L.* 1972, *c.* 45, § 59:1–1 to 12–3. The Act was designed "to reestablish the immunity of public entities while relieving some of the harsh results" of the doctrine of sovereign immunity. *Ponte v. Overeem*, 337 *N.J.Super.* 425, 428, 767 *A.*2d 503 (App.Div.), *certif. granted*, 168 *N.J.* 293, 773 *A.*2d 1156 (2001). Moreover, "[u]nderlying the reenactment of immunity was the Legislature's concern about that liability on the public coffers." *Brooks v. Odom*, 150 *N.J.* 395, 402, 696 *A.*2d 619 (1997) (citing *Report of the Attorney General's Task Force on Sovereign Immunity* 10 (1972)). Consistent with those purposes, the substance of the Act provides immunity for public entities with liability as the exception. *Collins v. Union County Jail*, 150 *N.J.* 407, 413, 696 *A.*2d 625 (1997). See *N.J.S.A.* 59:2–1a ("Except as otherwise provided by this act, a public entity is not liable for an injury . . . ."). Thus, notwithstanding the Legislature's stated purpose to ameliorate the harsh results of the strict application of the common-law doctrine of sovereign immunity, "the approach of the Act is to broadly limit public entity liability." Harry A. Margolis & Robert Novack, *Claims Against Public Entities*, comment to *N.J.S.A.* 59:1–2 (2001). Given that backdrop, we must consider whether the immunities under the Act, specifically pursuit immunity under *N.J.S.A.* 59:5–2b and good faith immunity under *N.J.S.A.* 59:3–3, apply to defendants.[1]

---

[1] A public entity will be held liable for the acts of its employees where those acts are carried out within the scope of employment. *N.J.S.A.* 59:2–2a. Thus, if the statutory immunities do not apply to defendant Conley, liability may be imposed on him and on defendants Camden Police Department and the City of Camden.

## A

### Pursuit Immunity

*N.J.S.A.* 59:5–2b(2) provides in part: "Neither a public entity nor a public employee is liable for: . . . *any* injury caused by . . . an escaping or escaped person." (Emphasis added). In *Tice v. Cramer,* 133 *N.J.* 347, 627 *A.*2d 1090 (1993), this Court was called on to decide whether *N.J.S.A.* 59:5–2b(2) applies to all injuries arising out of a police pursuit, even those that would not have occurred but for the negligence of the police. In that case a police pursuit ended with the fleeing vehicle colliding with a motorist, resulting in the motorist's death. The decedent's estate brought an action against the police officer, the police department, and the City, among others. *Id.* at 351, 627 *A.*2d 1090. This Court held that *N.J.S.A.* 59:5–2b(2) "confers absolute immunity except where the police officer engages in willful misconduct," *id.* at 356, 627 *A.*2d 1090, and that such immunity applies to all injuries arising out of the police officer's pursuit even though those acts would not have occurred but for the negligence of the pursuing officer. The *Tice* Court observed that "[t]he most likely legislative intention evinced by the statutory language in the context of police pursuit is that when the officer suspected someone of having violated the law and was pursing him, the officer's conduct was immune from liability." *Id.* at 361, 627 *A.*2d 1090. Consequently, "[t]he effect of section 5–2b(2) immunity would seem to be clear. The immunity relieves the officer (and the public entity—the immunity applies to both) of whatever liability would otherwise attach for the officer's negligent conduct in connection with the pursuit." *Id.* at 363, 627 *A.*2d 1090.

Chief Justice Wilentz, writing for the Court in *Tice,* set forth the policy considerations that are the basis for pursuit immunity:

[T]he justification is the encouragement of the police officer diligently and aggressively to enforce the law, thought to be diminished by the specter of tort liability. Not so clear, but equally applicable, is the policy consideration involved when the potential liability is that of the public entity for its "independent" negligence in failing to impose standards regarding pursuit, or in failing to train police officers in the execution of those standards. Obviously, such standards and training could

result in greater care on the part of police officers and in fewer injuries. But, equally obviously, the potential of tort liability might encourage standards and training so restrictive—for the purpose of avoiding injuries and liability—as to impede the ultimate goal of vigorous law enforcement, including the vigorous pursuit of suspects. It is true there might be much greater care, even better care, but it is also true that there might be less vigorous enforcement. The Legislature has made its choice, and we are bound by it.

[*Id.* at 365, 627 A.2d 1090.]

Those policy concerns support an interpretation of pursuit immunity that "immuniz[es] both the employee and the entity for *all* acts of negligence related to the injuries caused by the escape, whether those of the employee or the entity, and whether independent or not." *Ibid.*

It makes no difference if the injuries caused to third parties in vehicular pursuits are caused by the pursued, as in *Tice,* or by the pursuer. In *Fielder v. Stonack,* 141 *N.J.* 101, 661 A.2d 231 (1995), decided two years after *Tice,* it was the police car that hit a vehicle not involved in the pursuit. This Court rejected a distinction based on whether the car involved in the actual collision is the police car or the escaping vehicle as contrary to tort law concerning automobile negligence because "liability ordinarily depends on negligence and causation, not on which cars were involved in the actual collision." *Id.* at 111, 661 A.2d 231. The critical issue was not which vehicle was involved in the collision, but whether the injury was caused by the escaping person. *Id.* at 112, 661 A.2d 231. This Court noted that the policy decision that officers not be impeded in the vigorous enforcement of laws by the threat of civil liability evinces the Legislature's intent that immunity be conferred without regard to which vehicle was actually involved in the collision giving rise to the negligence claim. *Id.* at 120, 661 A.2d 231. As with *Tice,* policy was the polestar in *Fielder:*

Creating an exception to the general rule of immunity, depending on whether the officer is involved in the accident, would swallow the rule of immunity, deterring the officer not from acting negligently but from pursuing at all, subordinating doing what is right to doing what is most insulated from liability.

[*Ibid.*]

In 1997, the Legislature essentially codified *Tice* and *Fielder* by amending *N.J.S.A.* 59:5–2 to provide that, in addition to the

immunity under subsection b(2), public employees are immune from liability for "any injury resulting from or caused by a law enforcement officer's pursuit of a person." *L.* 1997, *c.* 423, § 2 (codified at *N.J.S.A.* 59:5–2c).

■ Immunity under *N.J.S.A.* 59:5–2b(2) is also available when the injury is caused by something other than the instrument of the pursuit. In *Blunt v. Klapproth,* 309 *N.J.Super.* 493, 707 *A.*2d 1021 (App.Div.), *certif. denied,* 156 *N.J.* 387, 718 *A.*2d 1216 (1998), the police attempted to apprehend a man with two outstanding summonses who fled away on foot to his apartment. Two civilian crisis intervention specialists, one of whom was the plaintiff, were called to the scene. *Id.* at 498–99, 707 *A.*2d 1021. The plaintiff was shot after one of the police officers and the plaintiff attempted to enter the apartment. *Id.* at 500, 707 *A.*2d 1021. The Appellate Division concluded that immunity was available to the police under Section 5–2b(2) because the plaintiff's injury was caused by a person avoiding apprehension as a result of a police chase. *Id.* at 503, 707 *A.*2d 1021. *Blunt* thus established that Section 5–2b immunity is potentially available in a case where injuries result from the pursuit of an escaping person even though a vehicle or other instrumentality of pursuit is not involved. *Cf. Torres v. City of Perth Amboy,* 329 *N.J.Super.* 404, 748 *A.*2d 125 (App.Div.2000) (finding no "pursuit" where speeding vehicle not attempting to flee police).

In this appeal, plaintiff contends that the application of *Tice* and *Fielder* is circumscribed because those cases considered the pursuit immunity statute strictly in the context of motor vehicle pursuits. Plaintiff maintains that where injury caused by the pursuit results from a "gun shooting," rather than a vehicular pursuit, the immunity conferred by section 5–2b(2) has no application.

■ The Legislature, in our view, did not intend to limit pursuit immunity to vehicle pursuits. Police officers engaged in pursuits should not be impeded by the threat of civil liability. The putative exception for pursuit immunity, *N.J.S.A.* 59:5–2, created by the

Appellate Division in this appeal for injuries resulting from the use and handling of firearms, is inconsistent with the Tort Claims Act, its legislative history, case law and subsequent amendments to the Act.

We interpret *Tice* to mean that in order for pursuit immunity to apply the negligence implicated by the pursuit must be connected to the pursuit in a significant manner. The *Fielder* Court also established the rule that "[w]hether the negligent conduct involves the initiation, continuation, or conduct of the pursuit makes no difference: it is immune." 141 *N.J.* at 123, 661 *A.*2d 231. Here, defendant Conley entered and engaged in the pursuit with a firearm that was in the fire position. At the time of the pursuit and the discharge of the firearm, he knew or should have known that the safety was in the fire position. However, even if defendant was negligent in failing to ensure that the gun switch was in safety mode before commencing the pursuit, the pursuit substantially contributed to the discharge of the weapon. Defendant was chasing the suspect by foot and was forced to cross an alley-wide puddle. As he was running, defendant testified that "I feel my gun beginning to dislodge from my holster." We therefore disagree with the view of our dissenting colleagues that because the negligent discharge could have occurred at any place and at any time, the pursuit was not a substantial causative factor. It is plain that defendant Conley's earlier negligence, combined with the foot pursuit, contributed to cause plaintiff's injury. The initial negligence may have occurred prior to the pursuit but the gun's discharge, the immediate and proximate cause of the injury, occurred during the pursuit.

Moreover, even though defendant failed to return the switch on his firearm to the safety position earlier that day, he also was negligent in failing to ensure that the switch was in the safety position directly prior to commencing a foot pursuit with a drug suspect. The situation is analogous to the claim in *Tice* in which it was alleged that the City failed to properly train the police with respect to high-speed pursuits. Although the alleged negligent

conduct occurred prior to the pursuit, there would be a nexus between that negligent conduct and an injury caused during a pursuit. We are satisfied that on this record there is a sufficient connection between the negligence and the pursuit to accord defendant immunity. Plaintiffs, such as the one in this case, will continue to be able to assert that the injury that results from the pursuit was a product of willful misconduct.

The Appellate Division acknowledged the policy considerations that support immunity but concluded that "applying such a policy to the use and handling of firearms is counter-intuitive and offends common sense and rationality." *Alston, supra,* 332 *N.J.Super.* at 247, 753 *A.*2d 171. The court reasoned that "[f]irearms are deadly weapons whose use and handling by the police should be restrained and circumscribed. Inhibiting their use should be the operable norm." *Ibid.* The Appellate Division's decisional premises for its conclusion were primarily pre-Tort Claims Act cases in which this Court and the Appellate Division considered police-inflicted gunshot wounds. See *McAndrew v. Mularchuk,* 33 *N.J.* 172, 162 *A.*2d 820 (1960) (addressing officer who intentionally fired warning shot at ground that resulted in injury); *Davis v. Hellwig,* 21 *N.J.* 412, 122 *A.*2d 497 (1956) (concerning officer who intentionally fired at fleeing suspect striking bystander); *Wimberly v. City of Paterson,* 75 *N.J.Super.* 584, 183 *A.*2d 691 (App.Div.) (concerning officer who fired warning shot), *certif. denied,* 38 *N.J.* 340, 184 *A.*2d 652 (1962). However, the Appellate Division misplaced its reliance on those cases because they were decided prior to the enactment of the pursuit immunity provision.

The Tort Claims Act was intended by the Legislature to modify this Court's abrogation of sovereign immunity in *Willis v. Dep't. of Conservation and Economic Development,* 55 *N.J.* 534, 264 *A.*2d 34 (1970) and reinstate the rule that protects public entities from civil liability with the few limited exceptions expressly provided for in the provisions of the Act. In *Tice, supra,* 133 *N.J.* at 351, 627 *A.*2d 1090, this Court noted that there are two competing policy interests at issue in cases involving pursuit immunity: "the claim

that unless there is such immunity, police officers will be reluctant to enforce the law vigorously for fear of liability, and the opposing claim that such pursuits result in a large number of unjustified injuries that can be diminished only by the imposition of liability." This Court concluded that "that policy question is for the Legislature, which, as we read the law, has answered it in favor of absolute immunity, absent willful misconduct on the part of the police officer." *Ibid.*

Plaintiff's reading of the Act weakens the protections envisioned by the Legislature and opens the door to future equitable exceptions. *Tice,* in which this Court rejected a technical view of pursuit in favor of a more expansive approach, makes clear that immunity is available even in cases of pursuit-related injuries "that would not have occurred but for the negligence of the pursuing officer." *Tice, supra,* 133 *N.J.* at 347, 627 *A.*2d 1090. This Court in *Fielder* rejected a formalistic distinction between injury caused by the escapee or the police officer during the course of the chase. Extraordinary events occur during police pursuits and the emergent need for pursuits justifies the grant of immunity from civil liability for injuries caused entirely or in part by the course of the pursuit, absent willful misconduct on the part of the officer.

The Appellate Division noted the "incontrovertible fact" that "the immunity is fundamentally unfair to injured innocent bystanders." *Alston, supra,* 332 *N.J.Super.* at 246, 753 *A.*2d 171. That court concluded that "fundamental unfairness and the burden it imposes on bystanders confirms our analysis of legislative intent." *Ibid.* But it fairly can be argued that it also is fundamentally unfair to impose liability on police officers who risk their own lives in those pursuits, who by definition face emergency circumstances and extraordinary events in a pursuit, who act in good faith, and who should be encouraged to pursue suspects and to do so effectively. The unfairness to both the innocent bystander and the police officers is palpable, but society cannot have it both ways. It is difficult to imagine that the Legislature would expect a police officer to engage in a mental checklist of all prior

related acts before pursuing a fleeing suspect. Nor can we expect, indeed demand, effective law enforcement and then dilute that expectation with the imposition of liability because of the bystander who may be a victim of unfairness. Even if we discern that in some cases a bystander suffers the greater unfairness, it is nonetheless for the Legislature to speak to the issue. Although we are satisfied that the Legislature has spoken definitively and that the immunity is clear, it is free to reconsider the issue and alter the equation. Until then the Court must accept and apply the requirements of the statute.

 To sum up, the Legislature's intent, coupled with the decisional law, compels the conclusion that defendants are not liable for the negligent discharge of the weapon in this case.

## B

### *Willful Misconduct*

The next question is whether the trial court erred in instructing the jury on willful misconduct. Because the Appellate Division reversed the judgment of the trial court on the issue of pursuit immunity, it did not consider that issue.

Pursuit immunity under section 5–2b is "absolute except in the event of willful misconduct on the part of a public employee (see *N.J.S.A.* 59:3–14a)." *Tice, supra,* 133 *N.J.* at 367, 627 *A.*2d 1090. Thus, "[n]othing in this act shall exonerate a public employee from liability if it is established that his conduct ... constituted ... willful misconduct." *N.J.S.A.* 59:3–14a. Additionally, section 2–10 provides that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."

In this case, the trial court first instructed the jury that a violation of standing orders constitutes willful misconduct if the defendant intentionally disobeys a specific standing order of which he or she is aware. The trial court then instructed that willful misconduct also may be found with regard to the manner in which

defendant handled his weapon and holster. The court noted that "[w]illful misconduct is between simple negligence and the intentional infliction of harm. Conduct can be considered willful if it's done with the knowledge that injury is likely or probably will result in injury."

During deliberations, the jury asked the court to clarify the difference between negligence and gross negligence, and how that distinction affects the issue of willful misconduct. The trial court instructed the jury that

[t]o satisfy the requirement of willfulness, there must be a positive element of conscious wrongdoing and another way of looking at it is willful misconduct is the commission of a forbidden act with actual knowledge that the act is forbidden.

And finally, willful misconduct is a definition which is—does not include and is above what you might understand to be gross negligence or recklessness.

Plaintiff contends that the trial court erred in instructing the jury that willful misconduct "does not include and is above what you might understand to be gross negligence or recklessness." Citing *Fielder, supra,* 141 *N.J.* at 124, 661 *A.*2d 231, plaintiff argues that this Court has long recognized that one who acts with the knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, commits an act of willful misconduct.

In *Fielder, supra,* this Court held that "in the context of a police officer's enforcement of the law, including the pursuit of a fleeing vehicle, willful misconduct is ordinarily limited to a knowing violation of a specific command by a superior, or a standing order, that would subject that officer to discipline." 141 *N.J.* at 125, 661 *A.*2d 231. "More particularly, willful misconduct in a police vehicular chase has two elements: 1) disobeying either a specific lawful command of a superior or a specific lawful standing order and 2) knowing of the command or standing order, knowing that it is being violated and, intending to violate it." *Id.* at 126, 661 *A.*2d 231.

This Court was careful to note that it did "not presume to define willful misconduct in any context other than police vehicular pursuit under 5–2b(2)." *Id.* at 125, 661 *A.*2d 231. That is because

"[l]ike many legal characterizations, willful misconduct is not immutably defined but takes its meaning from the context and purpose of its use." *Id.* at 124, 661 *A.2d* 231. This Court did note, however, that "[p]rior decisions have suggested that willful misconduct is the equivalent of reckless disregard for safety." *Ibid.* "It is more than an absence of 'good faith.' " *Ibid.* (quoting *Marley v. Borough of Palmyra*, 193 *N.J.Super.* 271, 294–95, 473 *A.2d* 554 (Law Div.1983)).

■ We conclude that the trial court's instruction that willful misconduct required something between simple negligence and the intentional infliction of harm was not improper. It is clear that willful misconduct requires "much more" than mere negligence. *Fielder, supra,* 141 *N.J.* at 124, 661 *A.2d* 231. It also is clear that willful misconduct will fall somewhere on the continuum between simple negligence and the intentional infliction of harm. *Id.* at 123, 661 *A.2d* 231 (citing *Foldi v. Jeffries*, 93 *N.J.* 533, 549, 461 *A.2d* 1145 (1983)). What is not clear, however, is where on the scale willful misconduct should fall in a case such as this. In *Fielder, supra,* this Court noted that "[p]rior decisions have suggested that willful misconduct is the equivalent of reckless disregard for safety." 141 *N.J.* at 124, 661 *A.2d* 231 (citing *McLaughlin v. Rova Farms, Inc.,* 56 *N.J.* 288, 305, 266 *A.2d* 284 (1970)). However, *McLaughlin* also may be interpreted to suggest that "reckless" applies only to the "indifference to the consequences" aspect of its holding:

> [I]n order to recover for injuries allegedly produced by willful and wanton misconduct, it must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.
>
> [*McLaughlin, supra,* 56 *N.J.* at 305, 266 *A.2d* 284.]

Based on the language in *McLaughlin, supra,* the trial court's instructions are not erroneous.

## C

### Good Faith Immunity

Although we have determined that *N.J.S.A.* 59:5–2b immunizes defendants from liability, it is appropriate in this matter to consider whether defendants also are entitled to immunity under *N.J.S.A.* 59:3–3, which provides: "A public employee is not liable if he acts in good faith in the execution or enforcement of any law."

In *Fielder, supra,* this Court noted that good faith immunity may be applied to police pursuits. 141 *N.J.* at 132, 661 *A.*2d 231. The majority in *Fielder,* however, decided to apply pursuit immunity instead, finding that section 2b(2) better serves the legislative purpose of "relieving officers of the expense of litigation and the threat of civil liability, a deterrent to pursuits." 141 *N.J.* at 132, 661 *A.*2d 231. This Court explained that good faith immunity "would subject an officer's conduct to a more searching scrutiny, and would frequently require a trial on the merits to establish the reasonableness of the conduct at issue" and thus would not adequately fulfill the legislative goal. *Fielder, supra,* 141 *N.J.* at 132, 661 *A.*2d 231. We believe that that analysis has value in this appeal.

 "Good faith immunity under section 3–3 has two alternate components." *Id.* at 131, 661 *A.*2d 231 (citing *Tice, supra,* 133 *N.J.* at 374, 627 *A.*2d 1090, and *Bombace v. City of Newark,* 125 *N.J.* 361, 374, 593 *A.*2d 335 (1991)). A public employee either must demonstrate "objective reasonableness" or that he behaved with "subjective good faith." *Id.* at 132, 661 *A.*2d 231. A public employee need prove only one component. Immunity attaches if the employee can show either objective or subjective good faith. We note that both forms of good faith overlap as a matter of fact and law.

Our courts have cited with approval the Supreme Court's standard in *Harlow v. Fitzgerald,* 457 *U.S.* 800, 815, 102 *S.Ct.* 2727, 2736–37, 73 *L.Ed.*2d 396, 408–09 (1982) for application of those terms:

The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland*, 420 *U.S.* 308, 322, 95 *S.Ct.* 992, 1001, 43 *L.Ed.*2d 214 (1975). The subjective component refers to "permissible intentions." *Ibid.* ... Referring both to the objective and subjective elements, we have held that ... immunity would be defeated if an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the (plaintiff), or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury...." *Ibid.*

■ Although " 'good faith' pursuant to *N.J.S.A.* 59:3-3, and the Legislature's refusal to grant the officer immunity in those cases in which the officer acts with 'willful misconduct,' *see N.J.S.A.* 59:3-14a, are not necessarily two sides of the same coin," the distinction between the two "is a narrow one." *Fielder, supra,* 141 *N.J.* at 137, 661 *A.*2d 231 (Stein, J. concurring). Defendant's actions may have been negligent, but "negligence does not necessarily prevent a finding of 'good faith.' " *Id.* at 138, 661 *A.*2d 231.

■ We believe that defendant's conduct at the time of the pursuit was objectively reasonable. Prompt response to criminal complaints, such as suspected drug transactions, is essential to protect the public. An officer who is forced to stop and check his weapon may lose valuable time, possibly allowing the suspect to escape. We emphasize that police are often forced to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor,* 490 *U.S.* 386, 397, 109 *S.Ct.* 1865, 1872, 104 *L.Ed.*2d 443, 456 (1989). Defendant's pursuit of the suspect without first checking his firearm must be viewed in that context. The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them. *Ibid.* Assuming that the jury credited plaintiff's version of events at trial, defendant Conley merely was engaged in a foot pursuit with a drug suspect in an alley containing a large puddle while trying to apprehend that suspect. Defendant Conley's commencement of the pursuit was objectively reasonable.

■ In any event, we conclude that defendant's conduct was subjectively reasonable as well. The question is whether defen-

dant's conduct was subjectively reasonable based on the totality of circumstances, including those events preceding and following the chase, as well as the pursuit itself. However, it is defendant's conduct at the commencement of and during the pursuit that is the essential gauge. Thus, earlier that day defendant accidentally, and we assume negligently, left his gun in its fire position. There is no evidence that he was aware, at the start of the pursuit, that the gun was in the fire position. He did not check the safety mechanism while he was concentrating on, and pursuing, a fleeing suspect. After the weapon discharged, he claimed that he abandoned his pursuit, called an ambulance for plaintiff, and tended him until the ambulance and back-up vehicles arrived.

For the reasons expressed above, we conclude that defendant's conduct in the pursuit of a suspect under exigent circumstances was not objectively or subjectively unreasonable. We recognize that the concepts overlap. However one denominates it, good faith insulates defendants from liability.

### III

For the reasons stated, we reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division.

LONG, J., dissenting

My difference with the majority is a fundamental one arising from its failure to differentiate between the two distinct types of conduct presented in this case: Officer Conley's volitional choice to begin his shift by improperly holstering a weapon with the safety off and his later pursuit of a person engaged in criminal conduct. Unlike a public entity, liability of a public employee is the rule rather than the exception. *N.J.S.A.* 59:3–1a. By blurring the line between the two types of conduct, the majority has swept under the blanket of pursuit immunity, *N.J.S.A.* 59:5–2b(2), acts the Legislature never intended to insulate from liability. This case is no different from one in which an officer chooses to begin his shift in a vehicle that he knows has bald tires and no brakes.

Under those circumstances, his later victimization of an innocent third party during the pursuit of a felon is surely not within the contemplation of *N.J.S.A.* 59:5–2b(2).

The issue is not whether guns are intrinsically different for immunity purposes. They are not. *See Blunt v. Klapproth,* 309 *N.J.Super.* 493, 503, 707 *A.*2d 1021 (App.Div.) (finding pursuit immunity applicable where third party is shot and injured by person avoiding apprehension), *certif. denied,* 156 *N.J.* 387, 718 *A.*2d 1216 (1998). An officer's use of a gun during a legitimate pursuit is insulated from liability by *N.J.S.A.* 59:5–2b(2) in the absence of willful misconduct. *Tice v. Cramer,* 133 *N.J.* 347, 356, 627 *A.*2d 1090 (1993).

What is not immunized from liability by the happenstance of a pursuit, is an earlier decision to begin a shift with an improperly holstered gun with the safety off. There is no logical nexus between that conduct and the later pursuit. The injury caused by Officer Conley could just as easily have occurred while exiting his vehicle during his shift or entering a restaurant for lunch. To insulate such conduct from liability to an innocent victim by invoking pursuit immunity violates the letter and spirit of that provision.

Moreover, as a matter of policy, allowing the application of pursuit immunity here will not advance the Legislature's desire that police vigorously enforce the law without fear of liability. This case does not implicate an officer's split second decision to engage in pursuit. What is at stake is whether the officer was at fault in his earlier handling of his firearm. Although there can be no argument but that Conley's conduct was the cause of Alston's injuries, that conduct was unrelated to the pursuit.

In *Fielder v. Stonack,* 141 *N.J.* 101, 123, 661 *A.*2d 231 (1995), we held that "[w]hether the negligent conduct involves the initiation, continuation, or conduct of the pursuit makes no difference: it is immune." Conley's wrongful conduct long preceded the initiation, continuation and conduct of the pursuit, and thus falls outside the immunity provided in *N.J.S.A.* 59:5–2b(2). The majority's opinion

overreads the protection of the statute in a way that insulates from liability conduct that is unrelated to a pursuit. That is unfair to innocent third parties. Thus, I would affirm the Appellate Division's conclusion that pursuit immunity is inapplicable in this case.

Regarding the alternative of good faith immunity, I agree with the majority that *N.J.S.A.* 59:3–3, as a theoretical matter, applies to a police officer engaged in a pursuit. *Fielder, supra,* 141 *N.J.* at 130–33, 661 *A.*2d 231. The reason for its applicability is obvious: he or she is acting "in the execution or enforcement of any law." *N.J.S.A.* 59:3–3. However, because I continue to distinguish, as a matter of law and fact, Officer Conley's earlier improper handling of his gun from the pursuit, I believe that any good faith analysis would have to focus on that earlier conduct. The problem presented is that *N.J.S.A.* 59:3–3 only applies where acts are actually done in "execution or enforcement" of the law. Harry A. Margolis & Robert Novack, *Claims Against Public Entities,* Comment to *N.J.S.A.* 59:3–3, (Gann 2001); *Bombace v. City of Newark,* 125 *N.J.* 361, 367, 593 *A.*2d 335 (1991). Officer Conley's negligent conduct in the handling of his weapon earlier in his shift was preliminary behavior unrelated to a law enforcement or execution initiative.

The immunity conferred by *N.J.S.A.* 59:3–3 is limited, and its dimensions are narrower than the scope of a police officer's employment or the performance of his official duties and functions. Not every act or omission by a police officer while on duty is immunized by *N.J.S.A.* 59:3–3. Instead, a police officer is granted immunity only when he is negligent while actually engaged in the enforcement or execution of a law. Generally, the determination of whether an officer is executing or enforcing a law is a question that must be determined by the trier of fact in light of the circumstances. However, the issue may be decided as a matter of law where the evidence is either undisputed or susceptible of only one possible interpretation. That is the case here. Officer Conley's mishandling of his weapon at an earlier point in his shift is

simply not the kind of act "in the execution or enforcement of any law" that the Legislature meant to insulate in *N.J.S.A.* 59:3–3 in contravention of the general rule regarding the liability of public employees.

I would thus affirm the judgment of the Appellate Division and reverse and remand the case for trial at which neither pursuit immunity under *N.J.S.A.* 59:5–2b(2) nor good faith immunity under *N.J.S.A.* 59:3–3 may be invoked by defendants.

Chief Justice PORITZ and Justice COLEMAN join in this opinion.

*For reversal*—Justices STEIN, VERNIERO, LaVECCHIA and ZAZZALI—4.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN and LONG—3.